The United States Court of Appeals for the Federal Circuit is now open and in session. God Save the United States and this Honorable Court. May it please the Court, the Board's decision in this case must be overturned because it misapplies this Court's precedent in both. I fail to define the five trademarks for Penza and Taranto, famous and strong. That error contaminates the entire analysis, particularly the examination of the similarities between the parties' marks, where the Board erred by dissecting those marks and then assuming consumers would ascribe certain meanings to those marks for which there was no record evidence whatsoever. I'd like to first turn to the Bose case, and the issue in Bose was essentially identical to the issue here. In Bose, the opposer sought to protect and establish fame of the product trademark's weight and acoustic weight, and the opposer sought to do so through evidence of sales and advertising, exactly as Bridgestone has done here. However, the Board found that there was no fame for those marks because that circumstantial evidence it held was not sufficient, and because the Bose housemark appeared with the product marks. Mr. Bishop, I gather that you aren't arguing any family of marks theory or dissimilarity or entitlement to some sort of general sound association because of the suffix of Bridgestone marks. Your Honor, we are not arguing a family of marks on appeal. We are, however, arguing that the Potenza mark is sufficiently similar to Melanza, as is Taranto sufficiently similar to Melanza, because of the suffix, the sound, and the case. The Board held that the three terms were not similar if you knock off the NCA at the end. That's correct, and that was absolutely an improper analysis because… What's wrong with it? Well, the… Maybe that the NCA just gave it a little Italian flavor, but up to that point, it may include dissimilarity. That's correct, and that was not supported by any record evidence, and the problem with that is, first, the dissecting of the marks, per se, was legal error, and in the Neutrogena case, the CCPA observed that consumers don't engage in the, quote, refined analysis of which lawyers are capable of taking these marks apart and then putting them back together. Even if they're consumers. Correct, correct. Consumers do not dissect them, give them meanings, and put them back together, even if lawyers are consumers, to your point, Ron. That dissection is an improper analysis, and what happened here was the Board concluded that consumers are going to see Potenza and interpret that to mean power, because that's the Italian translation of the word. The Board assumed that Toronto is going to indicate to consumers Tori, and that Malanga is going to indicate to consumers the city of Milan, but there is no record evidence for that. First, the Potenza law. The Board itself, in the Bottega Veneta case, had observed and held that when you're dealing with Italian marks, and I quote, they said, many millions of Americans cannot converse in Italian, and Italian mark has no meaning other than, perhaps, an Italian-sounding word. So it was improper to translate Potenza to power and assume that all consumers across the country are going to understand and make that connection, and in fact, there's record evidence that Potenza does not indicate power to consumers, or at least to Federal itself. The record at page A, 1995, shows that when Federal's witness was asked what Potenza means, he answered, I don't know what's the meaning of Potenza. Now, for Toronto, the Board assumed that that means Tori, but Toronto is a made-up word. It has no meaning. So it was entirely improper for the Board to say that consumers are going to understand this made-up word, which means nothing, and describe it a particular meaning. It's not in the dictionary. It can't be found. It's the name of Bridgestone Park. The same can be said for Milanza. Milanza is a made-up word, and there is no record evidence that one consumer ever associated that word with the city of Milan. Now, when you look at the record evidence, the lack of evidence on dissimilarity, there is, on the other side of the equation, substantial evidence of similarity. Potenza, Toronto, and Milanza all share the same NDA suffix, and this suffix was enough for the CPDA to find similarity in the Simonides versus Fermanides case. Potenza, Toronto, and Milanza share the same rhyme and rhythm, and that was enough for this Court to reverse the Board and to find the marks Huggies and Dozens were confusingly similar. Potenza, Toronto, and Milanza share the same three-syllable structure and cadence, and that was enough for the CPDA to find, in the Parthian-Loral case, that the marks Lorato and Yodoro were similar, even though they acknowledged that the marks were not, quote, particularly similar in appearance, but yet they were confusingly similar because, quote, the cadence or lilt of one when other is quite similar to the other. Your argument that the Bowes case was misinterpreted, in this case, would lead us, if we agree with you, to take it to the conclusion that the Board made an error in using Bowes to find that these are not famous marks, that their characterization of consequences of the Board's Bowes error, as you see it. Absolutely, the consequences. Well, let me just, well, go ahead, if you wanted to qualify the answer. No, the consequence was, the failure to apply Bowes properly was that these marks were not found famous or strong. Oh, OK. And what would be the consequence, if we agree with you, as to the Board's analysis of Bowes? Would you turn it back to the Board to analyze this case in light of our correction of the misinterpretation of Bowes? I would propose, Your Honor, that the court should do what it did in Bowes and reverse the decision. And that's exactly what the court did in Bowes. They reversed it. And I don't think it needs to go back down. Of course, that would be one possibility. You don't agree with that. And you wouldn't turn it. Correct. I think, at the very least, it should go back down. But I think this court, under the presence of Bowes, could simply overturn the decision. Because it really is, you know, the Bowes case. So we would be making a determination at that point, I take it, that the larger shadow cast by the more famous mark as characterized after the Bowes analysis is complete is enough not only to call into question the Board's analysis, but to compel a different conclusion. Absolutely. Just as the court did in Bowes. Because in Bowes, there's a finding of no similarity also. And so what would be appropriate here is, because Bowes was not called, because the marks were not given their due fame or strength, that is enough to compel a reversal, because the similarity of the marks was not analyzed properly. As I just mentioned, with the lack of evidence on one hand, and the abundance of evidence showing that there was. But usually, failure to analyze properly is the kind of thing that leads one to think, well, go back and do it again. Correct? But you're suggesting, I take it, that not only did they fail to analyze it properly, but had they done so, there's no other result that they could have reached except to find that the opposition was consistent. That's correct. And that's because the strength of a mark and fame of a mark changes everything. And this court held in Bowes that it played a dominant role in the analysis. And with more fame, with more strength, the degree of similarity that's needed decreases. And that's particularly so in a case like this. You have identical goods, identical consumers, and identical trade channels. The trouble I'm having with your case and with Jennifer Bryson's question goes to it is, assuming Bowes was sui generis, that is, stands or falls on the particular facts of Bowes, your case, it seems to me, stands or falls on this particular fact as well. How strong was the mark? How much of it was erraticizing the link to Bridgestone, et cetera, et cetera. All the way through, it seems to me, what we're dealing with is finding the fact as it were, right, from which they drew a certain conclusion. We need to give our standard of what to do under this case. Well, you're asking for a mis- I'm finding the fact to have been supported by some potential evidence. So if you go through the record and look at each of these factual issues that you've raised, and I don't mean to preempt your continuing to raise additional ones, which I'm sure you will from your brief, in each of those cases, each of those fact-findings, it seems to me, there's arguments on both sides. And had I sat on the board, I probably would have gone to appeal, but I'm not on the board. I'm sitting here on appeal trying to decide whether there's substantial evidence in the record to support what the board said. And I'm having trouble with that problem, with that standard. Well, Your Honor, for- on the- there's two issues. One, the Seminaries of March we've discussed, and they were not supported by substantial evidence. There was no evidence in the record. But on the Bowes issue, the board's decision on pages 18 to 21 is clearly a legal error, because what they did was they said that the advertising and promotion in this case are impressive under any standard. And they were masked, the advertising, the promotion, the numbers. They had seen Bowes. They had seen other cases, as we identified in our brief. But what the board did was, they said that the advertising was masked, that there was substantial evidence of a claim for the potential Toronto marks. But then on pages 18 to 21, they said that these marks are not famous because the Bridgestone mark appears prominently in those edits. That was their wording. So that is a legal error, because the court in Bowes, this court said that if the marks appear on the same page, the same product, that did not detract from the claim so long as they stay apart from each other. And the court said they merely need to be decoupled from each other and not joined from each other. And that was enough. And so it was a legal error. The board's decision is all based upon the fact that Bridgestone appears in those edits. And that's a pure legal error, because they got Bowes wrong. They misapplied it. So what do you say? If I understand your potential speech, it's as if some ads wouldn't say for Dodge Caravan, would always say Dodge Caravan, then Mitchell. But if an ad says Escalade, and then down at the bottom it says Bond Cadillac, that's not good. Your Honor, I see you have a number for both of them. May I answer? I think that's an excellent question, because the court addressed this in Bowes. The court said if you had Intel Pentium, Ford Mustang, Apple Macintosh, Kellogg's Fruit Loops, say it. I would answer the judge's question. If the word Cadillac comes down at the bottom of the half page ad, Escalade by Cadillac, you're saying no connection. That's correct. Bowes, as a matter of law, says no connection. Correct. And no board could actually see that as connected. That's correct. Well, as a matter of law, it's an error to ignore this court's direction, that if they're decoupled, that that is sufficient for independent payment. And I think the best example— If it said Escalade by Cadillac, that is coupled. I think that could arguably couple, or if it was Cadillac, Escalade, all the time. But coupling alone does not detract completely from the independent significance. And I refer to page 44 of our blue brief. On page 44, we have an example from the actual Bowes record. And on page 44, you can see it says at the top, Bowes waited. They're connected. And in other parts, Bowes waited. And you also see Bowes is prominent in the piece, in the advertising piece. Even though they were connected, there was still found independent trademark significance, simply because Wave appeared somewhere else alone. On the page, on its own. And when you look at page 12 of our blue brief, you can see Potenda jumps out. Potenda is absolutely, completely divorced from Bridgestone. It's larger than Bridgestone. It's more prominent. It's much more persuasive case for decoupling. And again, I know to your question, Your Honor, that, well, it is a factual error. It's a legal error. Because the court said, so long as they're not joined, they're decoupled. That's not for independent saying. And page 18 to 21 of the board's decision, they ignored that completely. They disregarded it, and they misapplied it. We can't hear you very well, Your Honor. Thank you, Your Honor. Mr. Krueger. May it please the court. My name is Kevin Krueger, the Appellee Federal Corporation of Taiwan. We are here today to ask whether the unanimous decision of the trademark trial field board finding no likelihood of confusion, as supported by potential evidence, should be second guessed. I think the record shows that Bridgestone is a strong mark. But the same cannot be said for Potenda and Tarango. Yes, Your Honor. Well, to prove it ourselves, what I have trouble understanding is why an established thesis coming into this area would deliberately choose a mark that one can argue about. Whether or not the weight is on one side or the other, there certainly is room for argument. Why would one enter into such a context? I have advanced knowledge that some people may very well be confused. They may think that the, presumably, excellent tires are products of Bridgestone. Why would one get into this mess? Well, Your Honor, I think the record shows that the Federal chose this mark because they wanted the association with Milan. Are they made in Italy, these tires? These tires are not made in Italy, but they were intended for use in Milan. Are they made in Italy? The Federal is not made in Italy. No, but you could have chosen Milano or Milano-Lisa. Excuse me. But the NDA is getting awfully close, it does seem to me. I have exactly the same question that Judge Newman had. This isn't a case in which you had a mark for a while, and then all of a sudden you found yourself in an alternate situation in which you have two marks that are close together. And you pick the mark which is, maybe it's not too close, but it's pretty close to a mark that's already out there, and it's fairly well established. I think it's very important for us to do our analysis based on separating Milano from Firenze and Potemkin. The issue is likelihood of confusion. That is correct. The question of separation of a similarity is four squared. You can't separate them. You'd have to consider what the tire, I don't know if they do it there in Italy or not, I don't know how tires are made, but whether somebody who knows about tires might perhaps think these came from the same source. Why is that something that one would step up? Again, I think the evidence is clear from the record that Federal chose Milano because they liked the word Milano. And I think the board in the decision also looked at the fact that VA itself was not sufficient to distinguish the marks. I think we need to kind of step backwards and look at VA. Well, not necessarily different subjects, but I do believe you're right. Ben did likelihood of confusion, and are people really going to be confused? And again, I really think the record shows that the Bridgestone mark is strong here, and that any use of Potemkin or Firenze really is, I think it's just rightly mentioned, in the shadow of the Bridgestone mark. I don't think consumers are going to necessarily, again, based on the differences in the marks, overall commercial impressions, the analysis that the board went through, Milano, Potemkin, Teran, based on the dominant course of the first two syllables of each mark, that consumers, I think the board made the decision, as supported by the evidence, that there was a likelihood. So you think anybody seeing Milano tires would say, oh, this is a Federal product, I like that company? I think they're going to say, this is a Milano tire, and not be confused. Because they'll say, I, too, like Milano. I've been there. So I can buy a tire with that name. And I know the Bridgestone tires. So yes, I think that they're going to maybe get those patients with the city in the law. Well, of course, I know this isn't an issue. But whether we're entering into the arena of whether this is a deceptive indication of arbitration is, I suppose, if you start pressing, which means Milano tire, this would lead to Turing. Tire, this would lead to the nation building. Well, Your Honor, I believe in order for the mark to be deceptively descriptive, there consumers are going to be fooled into believing that these tires come from. I was trying to argue with why you said, because it calls up an image of Milano. It's therefore different from something that calls up an image of Turing. Or a policy of power. I was assuming, of course, that Bridgestone assumes such an image as a policy of power. Well, you know, I believe it's a record in the registration that they did enter the definition of potenza, meaning policy of power. So, I'm sure there are enough Italian speakers in this country who may associate that with that particular remark. I do believe, however, that the remarks are sufficiently different that there is no more confusion when used in association with the overall Bridgestone remark. Do you think that the standard for deciding liability in the trademark area should be any different when there's an intent to use, application in the market to get used, and therefore does he carry an investment with it as opposed to a permissioned use and a Your Honor, if I understand your question, I believe that the analysis on likelihood of confusion should not matter, at least from the point of view of the trademark office, on whether or not the application follows intent to use or based on use. Well, the reason that I ask is because there are a number of cases where the courts have talked about the obligation, whether or when there might be an obligation to avoid confusion. Your Honor, I would contend that the analysis is based on, the analysis doesn't change. That the, you run through the con factors to make a decision on whether or not there is a likelihood of confusion. Are we free to take the findings of fact that the court may, assuming there's substantial evidence to support them, and there's contested evidence on both sides? Any difference? There's a number of factors under the DuPont Act as well. Are we free to then add all of those up and come to a different conclusion, legal conclusion on the question of, is it important that a free judge be called on our part, as you understand it? I believe the standard of review, Your Honor, is de novo. On the question of whether there is. Whether or not there is likelihood of confusion. However, the court needs to look at the full record of evidence submitted before the board and make the decision based on whether or not there is substantial evidence to support the board's decision. I believe the In re Caroline case states that even if a different conclusion could be reached, if there is substantial evidence, that is not necessarily grounds for reversal. So long as there is substantial evidence to support the board's decision. This is substantial evidence to support the board's findings. That is correct. But with regard to the ultimate conclusion, we can add or subtract those. If the board makes up most findings in your favor, a few in theirs, we're open to calling either way. I believe, Your Honor, you need to look at whether or not the board's decision was supported by the facts. And, again, I think in any trademark case, the review, each factor can be applied and balanced. And the amount of emphasis given to each factor, it's not dependent on the case in which they're being applied. But that sounds like it would lead us to conclude that the overall standard of review for likelihood of confusion would be substantial evidence. I mean, you're suggesting that, but you're not... Certainly, we should adopt that standard of review for the overall determination of likelihood of confusion. I believe the court needs to look at the decision of the board. Right. You can review it de novo. Right. If there is substantial evidence... The decision as to whether there's a likelihood of confusion. Yes, correct. Okay, so we're reviewing that de novo. Yes. And looking at the underlying factual findings with deference under substantial evidence. Right. So it sounds like that would lead one to conclude that once one has sorted out all of the factual findings and deferred appropriately, that we then proceed to, as Judge Flake put it, to weight the various factual findings as we see fit. And yet, you seem to be resisting his characterization of our role at that post-factual stage. Because if that's not what our role is, then why would that be de novo review? Okay, it's a very good question, Your Honor. I don't know if I really have a really good answer for that. You're acknowledging that de novo review is the appropriate standard for substantial evidence? Yes, Your Honor. All right. The de novo field that we're picking, I've never understood our standard of review. And we say, you know, factual findings, substantial evidence, and records. But the ultimate judgment is de novo. I don't know what that means, because that simply means that we do the same thing that the Board did. I couldn't think that's what we would do, but that seems to be what we're supposed to do. We ask that the Court go through the Board's analysis, look at the evidence of records, and I believe you'll find substantial evidence to support the Board's decision finding the one that you're confused on. You're spinning me for a head. One of the points that Brigida raises that I'd like to address is the Bowes case. You know, you asked quite a few questions about the Bowes case. I believe that the facts in Bowes are different from the facts in the case. In Bowes, the evidence consisted of direct mail advertising, which contained frequent references to the Bowes waymark, apart from the Bowes housemark. Well, the key question puts it apart from me. Is it, in your view, apart from if the word Bowes appears at the bottom of the page and the way language appears incumbent displayed a banner across the top? Or is it enough that they are conjoined if they both appear on the same page? I would agree that physical separation certainly is an easy indicator to say that the marks are decoupled one from the other. But if you look at the examples from Bowes, there were actual references in the material that decoupled the Bowes housemark from the product mark. And if you look at the example that Mr. O'Toole pointed out in history, at least in that first one, it's a consumer order form, which has specific sentences that say, to order the Wade radium. Not the Bowes Wade radium. The Wade radium. Wade radium was remote controlled. Shipping and handling, $15 per Wade radium. Separate. In Bowes, Wade was used separate from the Bowes housemark. Well, but that seems to me at least consistent with some of the evidence that Bridgestone had introduced, such as, there are several items in the reply brief, one of which is Taranza. Introducing the smoother, quieter Taranza. And this is at page 21 of the reply brief. And then down at the bottom of the corner, in pretty small title, the word Bridgestone. That sounds like decoupling to me. Well, your honor, I think we would take, we would look at that piece of evidence and point out that that's not necessarily a consumer-facing piece. I believe the board found that. That much of the, what they call the independent, what Bridgestone characterized as the independent media attention really was press releases released by Bridgestone and other pieces directed toward others in the entire industry, and not necessarily directed toward McSews. In Bowes, that media depth, that other media piece that's included in the Bowes opinion cited Duke and Lee's brief, again. Do you have access to the reply brief? I don't want to force you to. I'm sorry, I didn't bring it up. Well, let me just, you're probably familiar with this, but on page 19 of the reply brief. Thank you. Thank you. There is what looks to me to be a consumer ad. But if you look closely. And it says Taranza across the top, and then down at the bottom. But if you look closely, your honor, that looks like, that appears to us to be an ad that may or may not have ever been run. It says Acme Tires, 1-2-3-4-5 Main Street South, 555-1212. So, you know, we're looking at this ad. You're right, it does say Taranza at the top, but again, it's Bridgestone at the bottom. And, again, this is an ad page. Let's look at the next page. Yes, sir. Page one. You're right, it's unclear whether the Acme Tire ad ran. But look at the brochure on page 20. Presumably this is one of the Bridgestone brochures. You see Taranza is certainly highlighted. Bridgestone is on the top left corner. Is that coupled or decoupled? Or is that a silly question? I don't think it's a silly question, your honor. I think, though, that what is featured probably, though, is the Bridgestone market stock, the Bridgestone V logo at the bottom, and we would pretend that is what is being impressed upon the consumer, not necessarily Taranza. Yes, if you've gone in to look for tires and the dealer says, here's a brochure on Taranza, here you go. But I'm not necessarily sure that this stands as a proposition that consumers necessarily decouple Taranza from Bridgestone. Well, no. With respect to the ad that you pointed out, correct, Acme Tires, for one thing, it appears that it's usually the tires you see sold at 99 cents, which is a good deal. I'm not going to take them out of here. But I would suspect, and I guess you're probably going to tell us on the phone, that this was merely a form which was sent out to either franchisees or companies for inclusion in both newspapers. You know, like in the ads there said, I don't know, but you could tell us if you could tell us, that this form was actually used in advertising, which in that way would become the Acme Tire company in the 90s. But, again, do we know that this, did this ad appear by itself? Did it appear with other Bridgestone ad? All right. Thank you. Any more questions? I don't think I'd like to hang out at Acme Tires. Thank you. Thank you. Oh, I'm sorry. Thank you, Your Honor. I will clear some important questions up, and that is, these ads were run. Not in that form. Not in that form. And we have testimony in the record that these were sample forms that were sent to dealers across the country to use as advertising. And Phil Casey of Bridgestone testified, and I refer to page 8130, that these ads were actually run. And he has seen the various examples actually run. So rather than modify. Correct. That's right. Not with the 99 cents. But the modification, though, was not with the marks. It was that general form. And that's one of many, many, many, many ads in the record. The record evidence, especially when you compare it to the Bose evidence, is overwhelming. And I don't have to argue. I'm arguing as a matter of law, any time the identification of the company is physically separated by an inch or two from the name of the product, that that, as a matter of law, means no confusion. Or, I'm sorry, it means the opposite. It means confusion. Excuse me, Your Honor. Do you have a decoupling? Yeah. What I'm trying to find out is, does Bose, as you move, create some sort of rule of law that, as soon as you have a space between the two names, then the ownership? I'm trying to understand how you read Bose. Luckily, we don't have to make that decision because it's so separated here. I don't think, if it was just an inch or two right next to each other, that that would necessarily be decoupled. Well, that's really a factual question, isn't it, that whether something is here. That's correct. But the board here said the existence of Bridgestone at all. I understand. And that's why that's legal. But if, I think you would have to acknowledge that if the word is used what you consider the correct legal template, then their determination, if they determined that, well, this is close enough to be coupled, that would be factual. Yes. But thankfully, we don't have that here. And because they're so separated, they're not an inch apart. I mean, they're substantially far apart from each other. But that's by way of saying, if the board had reached such a conclusion there would have been no substantial evidence to support that factual finding had they used the right template. Correct. And I think that's absolutely right. So we can look at it one of two ways. One, legally, which it absolutely was. Or two, even had they used the right template, which they did not, that there was no substantial evidence, like the issue of similarity to support that finding. And they were coupled. Correct. That they were. But what would be substantial evidence that they were coupled? If the question is, in a given sheet of paper, do the names appear close enough? Is there some other evidence that would identify coupled from uncoupled? You say there's no substantial evidence to show they're uncoupled or coupled. What kind of substantial evidence would one look for when it's a single sheet of paper and it's a judgment call as to how close the two words are of confused? I think the only evidence that would support a finding that the marks were not decoupled would be a situation where every advertisement had Bridgestone, Potenza, or Bridgestone, Toronto together, and they were never separated. Or perhaps Potenza by Bridgestone. If the Bridgestone were in the same box. Perhaps, yes. So it would be a situation where there would be no decoupling. Because again, in Bose, this court said they have to be decoupled or not joined. And so once you have them decoupled or not joined, that satisfies the test. Were there proofs on you to prove whether they're coupled or decoupled? I would say that's a yes. Yes. And it is a burden of proof that we have. Because the record is teeming with examples of Potenza and Toronto far apart. And we just looked at a couple of examples in Greece. But the record is massive. I mean, you compare it against the Bose record, and it's just much more substantial, much more profound, much more decoupling. And to kind of sum up to a point that the panel raised, this court can look at the facts and decide there's likelihood of confusion. You have absolute discretion to do that. You can look, and after reviewing the individual likelihood of confusion factors, you can say the board made a mistake. This is wrong. That is completely within the court's judgment and jurisdiction to re-weigh the factors as a legal matter to determine whether or not the board made a mistake, which it did. Thank you, Mr. Bergen. Thank you, Mr. Berry. Congratulations. Thank you. Thank you.